**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

LVL CO., LLC,

                    Plaintiff,

        vs.

CITY OF EASTON,

                    Defendants.

Civil Action No.  5:18-cv-2695

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT AS TO LIABILITY ONLY**

Plaintiff LVL Co., LLC, by and through its attorney, Charles Bruno of Bruno Law, hereby submits his Memorandum of Law in Support of its Motion for Summary Judgment as to Liability Only, as follows:

**I.     INTRODUCTION**

In this case, Defendant takes the extreme position that it may escape from its obligations under a Settlement Agreement brokered by this very Court by denying Plaintiff the very consideration Defendant promised in exchange for its release from and voluntary dismissal of the underlying lawsuit.  The Settlement Agreement was the culmination of months of settlement discussions held by this Court and Magistrate Judge Marilyn Heffley on Civil Docket No. 5:14-cv-04707-EGS.  The docket reflects Defendant's participation in no less than four settlement conferences, including on March 6, 2015, March 10, 2015, March 12, 2015, and March 23, 2015, after which several status conferences were held as the parties negotiated settlement through December 2015.  The docket further reflects that the Court thereafter dismissed the underlying lawsuit with prejudice based on the parties' representation that they had reached settlement and would be finalizing the written Settlement Agreement.  Defendant ultimately accepted and

approved the Settlement Agreement by unanimous vote at a public meeting at which Defendant's Mayor and Councilmen represented that the Settlement Agreement was the product of negotiations before this Court, that it was the most efficient resolution, and that "the Federal District Judge was very much on board with this settlement."

By way of the Settlement Agreement, Defendant was released from a lawsuit in which its liability was patently obvious, exposing it to substantial damages and costs should it continue a likely fruitless defense. Its benefit was great, and its consideration for that release relatively simplistic: provide "land to erect and maintain a billboard", either at an identified site along Interstate 78 westbound or, should the permitting necessary for that site fail, at *another location acceptable to PA Media and LVL*. The parties' selection of these terms requiring Defendant's provision of an alternative site acceptable to PA Media and LVL should the first one fail, were chosen and drafted by well-represented, sophisticated parties whose inclusion of this provision was intentional, express, and unambiguous. Thereafter, the parties discovered that permits for the initial proposed site cannot be legally issued for a billboard because of applicable regulations restricting billboards on the subject Interstate Route 78 site. Without the ability to legally obtain the necessary permits, LVL invoked the clause specifically negotiated into the Settlement Agreement that allows it to select an alternative billboard site acceptable to it. Thereafter, Defendant denied LVL's alternative acceptable site and has refused in bad faith to provide City land in another location acceptable to LVL in accordance with the express terms of the Settlement Agreement.

To date, Defendant has reaped the entire benefit of this Settlement Agreement while frustrating and altogether eliminating the compensation it promised to LVL. Neither PA Media nor LVL, who owns the assets of PA Media, has received the billboard site in accordance with

the contract. Yet, it was this very intended benefit of the bargain that LVL purchased the rights to, at considerable price, when it acquired the assets of PA Media by way of an Asset Purchase Agreement and Addendum. Thus, LVL has lost not only the promised consideration (the billboard site), but also the money it paid to Abraham Atiyeh and Valley Realty Holdings to acquire the rights to receive that billboard site and operate a billboard on it. Defendant carries on with the full benefit of its full release from its financial exposure while denying LVL the consideration for the release. Even more, Defendant has appeared at hearings and opposed LVL's permit application for an alternative site acceptable to it, thereby further obstructing LVL's receipt of a billboard in the City in violation of Defendant's implied duty to perform its agreement with LVL in good faith. In doing so, Defendant thumbs its nose at the both the letter of the Settlement Agreement and this Court's efforts in reaching that Settlement Agreement. It takes the position that the situation is irreversible due to the fact that the underlying lawsuit was dismissed with prejudice once settled, and therefore LVL is without remedy, and that this Court should now endorse what is manifestly an injustice by denying Plaintiff its consideration for entering into the Settlement Agreement. Defendant gets the entire benefit of the brokered bargain, and gives up nothing. Defendant takes the release and dismissal, and unilaterally converts it to a gift unto itself by withholding its side of the deal. Defendant ignores the express intent of the parties as manifest in the Settlement Agreement to provide an alternative site acceptable to Plaintiff where the first one failed, in essence rendering its promises a lie and its good faith performance merely optional.

Plaintiff respectfully urges the Court to enforce what are the plain, unambiguous, and lawful terms of the Settlement Agreement to which Defendant agreed, and from which it has benefited while depriving Plaintiff of the same right. Plaintiff submits that *while the appropriate*

3

*form of relief – i.e., specific performance by Defendant of providing Plaintiff's selected billboard site versus monetary damages in lieu of specific performance for the value of the billboard site on City land that Defendant has failed to provide – may require an evidentiary hearing and further testimony and argument, Defendant's breach of the clear, unambiguous terms of the Settlement Agreement to which it agreed is undeniable: Defendant was released from all claims and the underlying lawsuit dismissed with prejudice in exchange for the leasing of land upon which LVL may erect and maintain a billboard, either at an identified site or another location acceptable to LVL, which has never been provided.* As Defendant has breached by not performing its end of the bargain, Plaintiff is entitled to judgment on the issue of liability, only, with a hearing to follow to determine the appropriate form of relief and/or amount of monetary damages.

## II.    PROCEDURAL HISTORY

Plaintiff, LVL, Co., LLC filed a Civil Action Complaint on June 26, 2018 against Defendant City of Easton. Plaintiff brought claims sounding in breach of contract (Count I) and violations of civil rights under 42 U.S.C. §1983 for depriving Plaintiff of property rights without just compensation (Count II). (See doc.1.) By agreement of the parties, the Court dismissed Count II of the Complaint, but denied Defendant's 12(b)(6) Motion to Dismiss Count I by Order dated August 8, 2019. (See doc.23.) Thereafter, Defendant filed an Answer to the Complaint on August 23, 2019. (See doc.24.)

The parties exchanged initial disclosures and, during a telephone conference with the Court on October 24, 2019, both parties agreed and represented to the Court their positions that the Settlement Agreement is unambiguous and that no discovery was needed at this time, but that the parties should submit cross-motions for summary judgment on Count I breach of contract on

the issue of liability. With respect to the issues of appropriate relief, be it monetary damages or specific performance, Plaintiff respectfully requests that should the Court grant summary judgment in Plaintiff's favor on the issue of Defendant's liability for breach of contract, a hearing be set at which time the Court may consider the appropriate form(s) and/or amount(s) of relief.

Following the conference, the Court entered an Order directing that the parties shall file motions for summary judgment by December 20, 2019. (See doc.27.) In accordance with Rule 56 of the Federal Rules of Civil Procedure and this Court's October 24, 2019 Order, Plaintiff hereby files the instant Motion for Summary Judgment.

### III.   STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's Statement of Undisputed Material Facts in support of its Motion for Summary Judgment is set forth in a separate document simultaneously filed with the instant motion as required by this Court's Policies and Procedures II.E.4.

### IV.   STANDARD OF REVIEW

Defendant cannot establish any genuine issue of material fact to preclude summary judgment in favor of Plaintiff in light of the well-established standard governing the instant motion as well as the clear and unambiguous obligations to which it agreed as consideration for the parties' Settlement Agreement.

Rule 56(a) of the Federal Rules of Civil Procedure permits a claimant to move for summary judgment on all or part of the claims. A party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Erie Telecomms. Inc. v.

City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988); Celotex Corp. vs. Catrett, 477 US 317, 322-23
(1986). When determining whether summary judgment is warranted, the facts culled from the
record should be viewed in the light most favorable to the non-moving party. Hugh v. Butler
Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). However, a dispute as to facts is not
"genuine" if the record taken as a whole could not lead a rational trier of fact to ultimately find
for the nonmoving party. N.A.A.C.P. v. North Hudson Regional Fire & Rescue, 665 F.3d 464,
475 (3d Cir. 2011). Nor can facts be characterized as "material" where they cannot affect the
outcome of the lawsuit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). The party opposing a summary judgment motion must do more than simply show
that there is some metaphysical doubt as to the material facts, Matsushita Elec. Industrial Co. v.
Zenith Radio Corp., 475 U.S. 574, 586–587 (1986), and "the mere existence of some alleged
factual dispute between the parties will not defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no *genuine* issue of *material* fact",
Anderson, 477 U.S. at 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (emphasis added).

## V.    ARGUMENT

Plaintiff moves for summary judgment on Count I of the Complaint (Breach of Contract)
on the issue of liability, with a hearing on the appropriate amount and/or form(s) of relief to
follow. Under Pennsylvania law, the elements of breach of an express contract are: "1) the
existence of a contract, including its essential terms, (2) a breach of a duty imposed by the
contract, and (3) resultant damages." Enslin v. The Coca-Cola Company, 136 F.Supp.3d 654,
674-675 (E.D. Pa. 2015)(quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa.
Super. 1999)). Because no genuine issue of material fact exists with respect to the existence of
the Settlement Agreement and its essential terms, Defendant's breach thereof, and resultant

damages, Plaintiff is entitled to summary judgment as a matter of law.  Plaintiff respectfully submits that while the appropriate form of relief – i.e., specific performance by Defendant of providing Plaintiff's selected billboard site versus monetary damages in lieu of specific performance for the value of the billboard site on City land that Defendant has failed to provide – may require an evidentiary hearing and further testimony and argument, ***Defendant's breach of the clear, unambiguous terms of the contract to which it agreed is undeniable***: Defendant was released from all claims and the underlying lawsuit dismissed in exchange for the leasing of land upon which LVL may erect and maintain a billboard, either at the identified site or another location acceptable to LVL, ***which has never been provided.***  The simple truth is that Defendant has gained to itself a windfall of dismissal with prejudice of a federal lawsuit while failing to provide to LVL, the intended beneficiary of the bargain, the benefit of that bargain in the form of land upon which to erect and maintain a billboard.  The form of relief including the amount of damages and any other relief that the Court may deem appropriate may need to be examined in a subsequent hearing, but in accordance with well-establish principles of contract interpretation and the express terms of the Settlement Agreement, the Court should grant summary judgment on the issue of Defendant's *liability* for Breach of Contract in favor of Plaintiff.

## A. THE SETTLEMENT AGREEMENT, INCLUDING ITS ESSENTIAL TERMS, CONSTITUTES A VALID CONTRACT ENFORCEABLE BY PLAINTIFF AS THE SUCCESSOR TO PA MEDIA, AND AS BOTH AN EXPRESSLY-NAMED AND INTENDED BENEFICIARY.

### 1.  The Settlement Agreement is a valid contract.

To establish the existence of an enforceable agreement under Pennsylvania law, one must show that: (1) both parties have manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and (3) there is mutuality of consideration.  Redick v. Kraft, Inc., 745 F. Supp. 296, 300 (E.D.

Pa. 1990) (citing Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986)(see also Szymanski v. Sacchetta, No. 10-2336, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012) (setting forth the elements of enforceable contract); Greene v. Oliver Realty, Inc., 363 Pa. Super. 534, 526 A.2d 1192 (1987)(A contract is enforceable when the parties have reached mutual agreement, have exchanged consideration, and have outlined the terms of their bargain with sufficient clarity.)

From the document itself, attached hereto as Exhibit "B", it is plain that the parties to the Settlement Agreement manifested, by their execution of same, an intention to be bound by the terms therein, and that the terms are sufficiently definite to be specifically enforced and supported by adequate consideration. Pursuant to the Settlement Agreement, Section 1. Dismissal, the parties stipulated to the dismissal of a then-pending federal lawsuit between PA Media and Defendant City of Easton, with prejudice, and the release of all claims against the City of Easton, in express consideration under Section 2 for Defendant providing PA Media with "land to erect and maintain a billboard", via a lease assigned to LVL. That is, at its core, the agreement requires Defendant to provide land to Plaintiff upon which Plaintiff may erect and maintain a billboard.

With respect to identifying the land to be provided by Defendant, the Settlement Agreement expressly identifies same with reference to Tax Parcel #M10 23 0310E (hereinafter "Proposed Site"), which is located next to Interstate Route 78 Westbound, *subject to the condition that the billboard be capable of receiving all applicable permits and licenses at that "identified site",* or else another billboard site/location *acceptable to PA Media and LVL.* (See Ex. "B", Section 15, Page 8.)

8

The parties to the Settlement Agreement stated that their agreement was "in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be bound by this Agreement," and executed it by their signatures.   (See Ex. "B", Preamble/Recitals.) Accordingly, the Settlement Agreement itself establishes the existence of a valid and enforceable contract; the parties manifested, in the writing itself, their intention to be bound by it, and the document contains a specificity of terms and is supported by admittedly adequate consideration.

2. Plaintiff LVL Co., LLC is a proper party with rights to enforce the Settlement Agreement against Defendant for breach of contract.

Although the Court denied Defendant's initial 12(b)(6) motion argument that Plaintiff lacks standing to enforce the Settlement Agreement, (see doc.23), it is anticipated that Defendant may attempt to now resurrect that argument at summary judgment.  Accordingly, the instant motion for summary judgment must make clear that Plaintiff LVL Co., LLC has standing and enforcement rights as both an expressly-named and intended beneficiary of the Settlement Agreement, as well as because Plaintiff is the purchaser of and successor-in-interest to PA Media's assets, including having purchased the rights to the underlying litigation resolved by the Settlement Agreement by way of an Asset Purchase Agreement and Addendum.  (See Ex. "A" and Ex. "B".)

a. LVL, as purchaser of PA Media's assets and rights pre-settlement, is a proper party to the contract will full rights to enforce it.

In August 2015, Plaintiff LVL, Co., LLC (hereinafter "LVL") purchased the assets of the entity known as Pennsylvania Media LLC (hereinafter "PA Media").  (See Ex. A.)  Said purchase included PA Media's rights from a previous civil rights case that it filed and was then pending against Defendant.  (Id.)  This purchase of PA Media's assets and rights in the lawsuit

occurred *prior to the settlement* of the underlying lawsuit via the Settlement Agreement, as evidenced not only by the date of the Settlement Agreement but by the express reference to LVL within the Settlement Agreement itself. (See Id.) LVL paid a considerable purchase price to acquire the rights to the Easton litigation, as it is referred to in the Asset Purchase Agreement, and the intended benefit of the bargain: a billboard site capable of erecting and maintaining a billboard at a particular location of value, or another location acceptable to LVL should that one fail to receive approvals.[1] Thus, LVL has lost not only the promised consideration (the billboard site), but also the money it paid to Abraham Atiyeh and Valley Realty Holdings to acquire the rights to receive that billboard site and operate a billboard on it.

Defendant accepted and approved the Settlement Agreement by Resolution dated April 13, 2016, or eight months after LVL agreed to purchase PA Media. (See Ex. "E".) Moreover, the parties stipulated to the dismissal of the underlying action with prejudice based upon mutual promises as set forth in the Settlement Agreement, including the leasing of land to LVL to erect and maintain a billboard, as well as the occurrence of a condition, specifically that the billboard be capable of securing its permits at the Proposed Site *or other billboard site/location acceptable to PA Media and LVL.* (See Ex. "B", Sections 1, 2, and 15.) Thus, LVL, which had purchased the assets of PA Media and was involved in negotiating the billboard site, *was expressly referenced as a party to and beneficiary of the Settlement Agreement's consideration.* (See Id.)

As a result of LVL's purchase of PA Media's assets and rights, LVL owned those rights and/or became a successor-in-interest to PA Media by virtue of its purchase and is therefore

---

[1] This is relevant not only on the issue of standing, but on the issue of Plaintiff's expectation damages: as Defendant has never provided LVL with the benefit of the bargain, LVL has lost not only the promised consideration (i.e., the billboard site), but also the money it invested/paid to Abraham Atiyeh and Valley Realty Holdings to acquire the rights to receive that billboard site and operate a billboard on it. LVL has not received what it paid for.

entitled to all of the rights that PA Media has under the Settlement Agreement with Defendant. (Compl. at ¶8.) In the Settlement Agreement, Defendant expressly agreed that "this Agreement shall be binding upon *and inure to the benefit of* the parties hereto *and their heirs, successors, and assigns*." (See Ex. "B", Section 10(c), Page 7.). Thus, Defendant contractually agreed to Plaintiff's standing as PA Media's successor. Moreover, by way of the Asset Purchase Agreement, LVL *paid valuable consideration for that status* and the benefit of the bargain manifested in the Settlement Agreement. (See Ex. "A" and "B".)

Moreover, the fact that Defendant had notice of LVL's interest/beneficiary status is patently obvious from the Settlement Agreement's explicit references to LVL's interest. LVL is referenced in the Agreement as the entity who would be utilizing and maintaining the promised billboard, (See Ex. "B", Section 2, Page 2), and as one who would select an alternative acceptable billboard site should permitting of the first one fail, (See Ex. "B", Section 15, Page 8). Any suggestion by Defendant that it was unaware of LVL's interest and relationship to PA Media during settlement negotiations and its approval of the Settlement Agreement is therefore belied by the contract itself. Additionally, the conduct of the parties thoroughly demonstrates Defendant's awareness of LVL's interest/beneficiary status. Immediately after approval of the Settlement Agreement, Defendant and LVL entered into a lease agreement and addendum thereto, for the Proposed Site referenced in the Settlement Agreement, which lease agreement and addendum were accepted and approved by Defendant via Ordinance No 5553 dated 4/27/2016. (See Ex. "F".) Thereafter, when the Proposed Site turned out to be illegal (that is, permits cannot be granted for the Proposed Site for a billboard because of applicable regulations limiting billboards on this specific site on Interstate Route 78), attorneys for LVL and Easton repeatedly corresponded concerning an alternative site. (See e.g., Ex. "I" and "J".) Thus, both

the Settlement Agreement itself and the conduct of the parties make it obvious and indisputable that Defendant was aware and agreed to LVL's interest, and expressly provided for it in the contract. These facts establish LVL's standing to enforce the Settlement Agreement against Defendant's breach since **LVL both owned PA Media's assets and rights prior to execution of the Agreement _and_ was expressly named in the Settlement Agreement as a beneficiary thereto**.

Notwithstanding LVL's clear rights under the Settlement Agreement, both those obtained through PA Media and its own as an expressly named beneficiary, LVL may legally enforce the Settlement Agreement and sue for breach of contract under several other well-established principles of contract law as follows.

> b. <u>LVL is an intended beneficiary of the contract with full rights to enforce it.</u>

The old rule governing third party beneficiaries under Pennsylvania law was that both contracting parties must have affirmatively expressed an intention that the third-party be a beneficiary in the contract itself. <u>Scarpitti v. Weborg</u>, 609 A.2d 147, 149-51 (Pa. 1992). Again, here, the parties to the Settlement Agreement did exactly that, expressly conditioning the lawsuit's release and dismissal upon Defendant providing land upon which to erect and maintain a billboard and, specifically, a billboard site acceptable to PA Media and LVL as beneficiaries. Nevertheless, the old rule requiring such an express statement of intended beneficiaries has gone by the wayside. In 1983, the Pennsylvania Supreme Court in <u>Guy v. Liederbach</u>, 459 A.2d 744 (Pa. 1983) carved out an exception to that rule and allowed a beneficiary to recover even where the beneficiary was not in privity of contract with the defendant and was not specifically named in the contract as an intended beneficiary. <u>See</u> <u>Scarpetti</u>, 609 A.2d at 149. In doing so,

12

Pennsylvania adopted the Restatement (Second) of Contracts §302 (1979) as a guide for the analysis of third-party beneficiary claims in Pennsylvania. Scarpitti, 609 A.2d at 149-50.

Section 302 states about intended beneficiaries:

"(1) Unless otherwise agreed between promisor and promise, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intentions of the parties and either

(a) the performance of the promise will satisfy an obligation of the promise to pay money to the beneficiary; or

(b) the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance."

Restatement (Second) of Contracts §302 (1979).  Consequently, determination of whether an individual is a third-party beneficiary involves a two-prong test:  (1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary, or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.  Guy, 459 A.2d 744; Weber v. Weber, 168 A.3d 266, 270-71 (Pa. Super. 2017); Scarpitti, 609 A.2d at 150-51.

LVL meets both prongs of this test to be an intended beneficiary with full rights to enforce the contract under Pennsylvania law.  First, recognition of LVL's right to the billboard site is absolutely appropriate to effectuate the intention of the parties, and Defendant's immediate entry into a lease agreement and addendum with LVL to provide said site within days of approving the Settlement Agreement proves it. (See Ex. "F".)  The fact that the parties expressly conditioned release of the claims in the underlying lawsuit upon provision of a billboard site acceptable to PA Media and LVL, leading to the lawsuit's dismissal, was a great benefit to Defendant.  Defendant thereafter entered into a separate lease with LVL to carry out its

13

obligations, conclusively demonstrating that recognition of LVL's rights is appropriate to effectuate the parties' intentions with respect to the Settlement Agreement. (See Ex. "B" at Section 1, 2, 10(C), and 15.) If it were not the parties' intention for LVL to receive the benefit of releasing Defendant from the underlying lawsuit, the parties would not have conditioned Defendant's release and dismissal of a pending lawsuit upon providing PA Media the Proposed Site, or an alternative site acceptable to PA Media and LVL, and then actually entering into a lease for a billboard site with LVL. Defendant's actions are a clear reflection of the parties' intention when entering into the Settlement Agreement to bestow benefits of said contract upon LVL.

On the second prong of what the circumstances indicate, i.e., what the Settlement Agreement itself and the conduct of the parties indicate, both demonstrate that Defendant intended to give the beneficiary, LVL, the benefit of the promised performance, namely the provision of the Proposed Site for its billboard or an alternative site acceptable to PA Media and LVL should the permitting of the Proposed Site fail. Thus, LVL meets both prongs of the test to be considered an intended beneficiary with full rights to enforce the Settlement Agreement under Pennsylvania law.

In sum, the Pennsylvania Supreme Court allows for third-party beneficiaries to sue for breach of contract "even though the actual parties to the contract did not express an intent to benefit the third party." Shumate v. Twin Tier Hospitality, LLC, 655 F.Supp. 2d 521, 535 (citing Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 168 (3d Cir. 2008). A third-party beneficiary may seek to enforce the rights of a signatory party to the contract because "under Pennsylvania law, a third-party beneficiary's rights and limitations in a contract are the same as

those of the original contracting parties." Id. at 271 (citing Miller v. Allstate Ins. Co., 763 A.2d 401, 405, n.1 (Pa. Super. 2000).

       c. LVL is "closely related" to the contract and therefore has full rights to enforce it.

    Courts have also applied agency principles to permit a non-signatory to enforce a contract where there is either a parent/subsidiary, ownership, or some other significant relationship between the signatory and the non-signatory. White v. Sunoco, Inc., 189 F.Supp. 3d 486, 494 (E.D. Pa. 2016). Thus, even where a person or entity is neither a party to an agreement nor a third-party beneficiary of it, that person or entity may nevertheless have rights and liabilities under a contract where they are closely related to the agreement in such a way that it would be foreseeable that they would be bound. Carlyle Investment Management, LLC v. Moonmouth Company, SA, 779 F.3d 214, 219 (3d Cir. 2015). In determining whether a non-signatory is "closely related to a contract", courts consider (a) the non-signatory's *ownership of the signatory*, (b) its *involvement in the negotiations*, (c) the *relationship between the two parties*, and (d) whether the non-signatory *received a direct benefit from the agreement*. White, 189 F.Supp. 3d at 494 (citing Carlyle Inv. Mgmt. LLC, 779 F.3d at 219).

    The record conclusively demonstrates LVL's standing on every factor considered by the court to establish a "close relationship" to the contract. LVL, a non-signatory, *owns the assets of the signatory*, PA Media, and did so prior to finalization of the Settlement Agreement in which both are named as beneficiaries of the billboard site provided as consideration for the conditioned release. (See Ex. "A" and Ex. "B".) LVL was *involved in the negotiations* of the Settlement Agreement, as evidenced both by its explicit naming within the document itself and Defendant's negotiation with LVL of a lease and addendum necessary to fulfill its obligations for its release and dismissal of the underlying lawsuit. (See Ex. "F" and Ex. "B", Sections 1, 2,

15

10(C), and 15.)   The *relationship between LVL and Defendant is one that speaks to the understanding that LVL has rights under the contract* that it may seek to enforce.   Over the course of many months following the revelation that the Proposed Site cannot be legally permitted under applicable regulations for billboards on interstate highways, and in an attempt to avoid litigation, LVL, by and through its representatives, had discussions and personally met with Defendant's Mayor regarding an alternative site acceptable to LVL under the Settlement Agreement.   (See Doc. 1, Compl. ¶15, and Doc.24, Answer ¶15 (admitting occurrence of said discussions regarding an alternative site); See Doc. 1, Compl. ¶16, and Doc.24, Answer ¶16 (admitting the occurrence of said meeting).)   Defendant itself counter-offered other billboard site/locations; however, none of those sites are acceptable to LVL for various reasons including failures to comply with applicable regulations..   (See Doc.1, Compl. ¶21, and Doc.24, Answer at ¶21 (admitting Easton's proposal of other billboard sites for LVL).)   The relationship of the parties over the course of these discussions manifests an understanding of LVL's close relationship to the Settlement Agreement; otherwise, they would not have been held.   Finally, the non-signatory, LVL, was meant to *receive a direct benefit from the Settlement Agreement*, namely a site upon which to place and maintain its billboard, or alternatively, should that site fail, an alternative site acceptable to it.   This is evident from the contract itself.   (See Ex. "B", Sections 2 and 15.)

Thus, LVL meets each prong of the "closely related" test necessary to enforce and be subject to the contract.   Had LVL breached, Defendant would have been able to enforce the Settlement Agreement as against LVL as a closely related party.   Conversely, LVL must be allowed to enforce the Agreement to which it is not only an expressly named beneficiary and intended third-party beneficiary, but also a "closely related" party. See White, 189 F.Supp. 3d at

494; Carlyle Investment Management, 779 F.3d at 219 (finding no error in lower court's conclusion that a non-signatory was "closely related to a contract" signed by an affiliated entity where both were owned by the same parent company and several provisions of the agreement itself suggested a close relationship between the affiliates); see also Bahrain v. Dahdaleh, 17 F.Supp.3d 461, 470 (W.D. Pa. 2016)(finding a "close relationship" where signatory entered into an agreement with affiliates of the non-signatory seeking to enforce the agreement, and where the non-signatory participated in negotiations and its involvement was known to the parties.)

        d. LVL has an implied contract with Defendant that it may fully enforce to the same extent as its express contract.

In addition to its status as a successor to PA Media, as an expressly named beneficiary, as an intended third-party beneficiary, and as a closely related party, LVL also has a contract with Defendant that is implied in fact.

A contract implied in fact is a contract that arises where the parties' intention to contract, instead of being expressed in words, is inferred from acts in light of the surrounding circumstances. Liss & Marion, P.C. v. Recordex Acquisition Corp., 983 A.2d 652, 659 (Pa. 2009); Camp Ne'er Too Late, LP v. Swepi, LP, 185 F.Supp. 3d 517, 542 (M.D. Pa. 2016). Contracts may be implied from the course of the parties' conduct and dealings, including their actions, statements, and benefits they receive from an agreement. Camp Ne'er Too Late, LP. 185 F.Supp. at 542. It can be found by looking to the surrounding facts of the parties' dealings. Id. at 543. "Implied contracts...arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." Id. An implied contract has the same legal effect as any other contract, and may be enforced as such. Liss & Marion, P.C., 983 A.2d at 661; Camp Ne'er Too Late, LP, 185 F.Supp. at 543.

As discussed above, the record thoroughly establishes an implied contract in the alternative to the clearly express one. The course of the parties' conduct and dealing here evidence that Defendant specifically agreed to condition PA Media's dismissal of its lawsuit and full release of Defendant from all claims upon the granting of a billboard site to LVL. The best evidence of this is that immediately after approving the Settlement Agreement at a public meeting on April 13, 2016, Defendant entered into a lease for the Proposed Site named in the Settlement Agreement with <u>LVL.</u> (See Ex. "E" and Ex. "F".) When the Proposed Site was discovered to be incapable of securing permits to erect and maintain a billboard as called for by the parties' Settlement Agreement, Defendant met with LVL in an attempt to negotiate LVL's proposed alternate acceptable site. It is therefore clear that both parties, LVL and Defendant, expected the other to receive a benefit from the contract, the former an acceptable site to build and operate its billboard, and the latter the elimination of its substantial exposure in a then-pending lawsuit. These circumstances, "according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." As such, this is yet another basis upon which LVL may enforce its contractual rights under the Settlement Agreement and sue for Defendant's breach thereof.

**B. THE SETTLEMENT AGREEMENT IS UNAMBIGUOUS AND, AS A MATTER OF LAW, REPRESENTS THE FULL, COMPLETE, AND ENFORCEABLE AGREEMENT THAT GOVERNS THE RIGHTS AND RESPONSIBILITIES OF LVL CO., LLC AND THE CITY OF EASTON IN THIS MATTER.**

With respect to interpreting the parties' contract, it must first be noted that the parties do not dispute that the Settlement Agreement which forms the basis of Plaintiff's Count I claim for Breach of Contract is unambiguous. Both parties, through their respective counsel, represented to the Court during the October 24, 2019 telephone conference in this matter their joint belief that the dispositive provisions of the Settlement Agreement on the issues here presented <u>are clear</u>

and unambiguous, though they may differ on the effect of those provisions.

The Pennsylvania Supreme Court in <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, enunciated and explained the guiding principles concerning the inadmissibility of parol evidence:

> "Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but ***the only, evidence of their agreement***. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and ***its terms and agreements cannot be added to nor subtracted from by parol evidence***. <u>Gianni v. Russell & Co.</u>, 281 Pa. 320, 126 A. 791, 792 (1924) (citations omitted); <u>see</u> <u>also</u> <u>Scott v. Bryn Mawr Arms, Inc.</u>, 454 Pa. 304, 312 A.2d 592, 594 (1973).

578 Pa. 479, 497-98, 854 A.2d 425, 436 (2004)(emphasis added).

Here, the parties entered into a Settlement Agreement containing an integration clause stating that it represents the entire agreement of the parties, "a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution." <u>Yocca</u>, 578 Pa. at 497-98, 854 A.2d at 436; (See Exhibit "B", Section 10(B)("Complete Agreement")). Moreover, as the parties appear to agree, none of the terms dispositive to the instant breach of contract claim before the Court is ambiguous. Accordingly, under well-established principles of contract interpretation, the Court is called upon to interpret the parties' contract within the four-corners of the document itself without resort to parol evidence. Specifically, the Court is called upon to interpret the provisions of the Settlement Agreement that require, <u>as the express consideration for the Settlement Agreement including the full release of all claims against Defendant and dismissal of the underlying lawsuit</u>, that the City of Easton shall provide "land to erect and maintain a billboard" (Ex. "B" Sections 1 and 2) specifically in the form of the Proposed Site along Interstate Route 78 Westbound, so long as said site was capable of receiving its permits, <u>or other billboard location</u>

*"acceptable to PA Media and LVL"*.  (See Ex. A, Sections 1, 2, and 15.)

The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles. Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001 (3d Cir. 1980).  The subjective intent of the parties is immaterial; instead, they are bound by the objective manifestations of their intent, and in the case of a written contract the intent of the parties is the writing itself.  Id. Absent fraud or unconscionability, courts should not set aside terms on which sophisticated parties agreed.  John B. Conomos, Inc. v. Sun Co., Inc. (R & M), 831 A.2d 696, 708 (Pa. Super. 2003); See also Vasilis v. Bell of Pa., 409 Pa.Super. 396, 598 A.2d 52 (1991).

When the words are clear and unambiguous, the intent is to be determined only from the express language of the agreement, PBS Coles, Inc. v. Burnham Coal Co., 384 Pa. Super. 323, 558 A.2d 562 (1989), and extrinsic or parol evidence of intent is not admissible, Giant Food Stores, LLC v. THF Silver Spring Development, L.P., 2008 PA Super 245, 959 A.2d 438 (2008). See also Shepard v. Temple University, 2008 PA Super 93, 948 A.2d 852 (2008); Step Plan Services, Inc. v. Koresko, 12 A.3d 401 (Pa. Super. 2010).  A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of simple facts on which, from the nature of language in general, its meaning depends, and a contract is not rendered ambiguous merely because the parties do not agree on the proper construction or because the words at issue are legal terms of art.  Parshall v. Parshall, 385 Pa. Super. 142, 560 A.2d 207 (1989); Vogel v. Berkley, 354 Pa. Super. 291, 511 A.2d 878 (1986); Krobin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96 (3d Cir. 1986).

In interpreting a written contract, "the court will adopt the interpretation which under all the circumstances ascribes the most reasonable, probable, and natural conduct of the parties,

*bearing in mind the objects manifestly to be accomplished.*" Village Beer & Beverage, Inc. v. Vernon D. Cox & Co., Inc., 327 Pa.Super. 99, 475 A.2d 117, 121 (1984)(emphasis added); Charles D. Stein Revocable Trust v. General Felt Industries, Inc., 749 A.2d 978, 980-81, 2000 PA Super 103 (2000).   For example, where the parties seek in settlement to accomplish a full release and dismissal of all claims against one party by providing another party with an acceptable site upon which to build and maintain a billboard, the court's interpretation of the contract must reflect those manifest objectives.

   *Words having common or generally accepted, ordinary meanings are taken to have been so intended unless it is plain from the context in which they were used that they were intended to be used in another sense.* Motor Coils Mfg. Co. v. American Ins. Co., 308 Pa. Super. 568, 454 A.2d 1044 (1982)(emphasis added).   For example, when the parties condition the occurrence of an event upon  one party providing a location "acceptable to" a particularly-named party, that phrase "acceptable to [party]" is taken to have been intended to mean what it says.

   *A written contract must also be construed as a whole, and each and every part of it must be taken together in context and given effect if possible.* Motor Coils Mfg. Co. v. American Ins. Co., 308 Pa. Super. 568, 454 A.2d 1044 (1982).   In other words, Defendant cannot ask this Court to interpret Section 15 in isolation and divorced from other critical sections like Sections 1 through 3 of the Settlement Agreement concerning the express consideration for its dismissal and release, nor cherry-pick snippets of provisions contextually removed from the document as a whole so as to defeat the "objects manifestly to be accomplished" by the Settlement Agreement.   *The intention of the parties must be ascertained from the entire instrument, and an interpretation will not be given to one part which will annul another part.*

Keystone Fabric Laminates, Inc. v. Federal Ins. Co., 407 F.2d 1353 (3d Cir. 1969). Insofar as reasonably possible, separate provisions of a contract should therefore be read so as not to conflict with each other. Harrity v. Continental-Equitable Title & Trust Co., 280 Pa. 237, 124 A. 493 (1924).

Bearing these fundamental principles of contract interpretation in mind, the plain terms of Settlement Agreement bear unassailable witness to Defendant's Breach of Contract. Specifically, in Section 1, "Dismissal", and Section 15, "Condition", of the Settlement Agreement, the parties stipulated to the dismissal of an underlying federal court action with prejudice based upon mutual promises as set forth in the Agreement and the occurrence of a condition, specifically, PA Media being granted a billboard capable of receiving licenses/permits at the identified site to be located in Easton on Tax Parcel #M10 23 0310E (hereinafter "Proposed Site"), which is located next to Interstate Route 78 Westbound, *or other billboard site/location acceptable to PA Media and LVL*. (See Ex. "B", Sections 1 and 15.) Section 1 establishes that the dismissal of the underlying action was being agreed to in exchange for the parties' mutual promises (which includes the Section 2 promise to provide land) and the occurrence of the express condition as stated in Section 15. Section 2 further and expressly identifies the provision of "land to erect and maintain a billboard" in the form of a lease between Plaintiff and Defendant as the consideration for the full release of all claims against Defendant in that lawsuit, and Section 15 states clearly that the release is conditioned upon provision of the Proposed Site for the billboard being capable of receiving its permits/licenses receiving permits; otherwise, Defendant is to provide another billboard site acceptable to PA Media and LVL. (Exhibit "B", Sections 2 and 15.) Section 3 of the Settlement Agreement, "Release of Claims", also contains the parties agreement that "*notwithstanding the occurrence of any event(s)*

*subsequent to the execution of this Agreement that could be construed as a breach of this Agreement, the release set forth herein shall remain in full force and effect to release claims* based on events that occurred before the execution of this Agreement." (Exhibit "B", Section 3.) In other words, the release is irrevocable and unbreakable, even by a party's breach as has here occurred.

This language is not obscure or esoteric. It is neither confusing, nor vague. Rather, it is "not only the best, but the only, evidence of their agreement". <u>Yocca</u>, 578 Pa. at 497-98, 854 A.2d at 436. It is the terms chosen by the parties, *"bearing in mind the objects manifestly to be accomplished"*. <u>Village Beer & Beverage, Inc. v. Vernon D. Cox & Co., Inc.</u>, 327 Pa.Super. 99, 475 A.2d 117, 121 (1984). The provisions, when read together, as a whole and in context as required, with an interpretation that gives meaning and effect to each and every part if possible, leads to the inescapable conclusion that the parties' agreement was intended to effectuate a release of claims against Defendant and dismissal of the underlying action in exchange for providing land to Plaintiff upon which a billboard would be erected that is capable of permit, and acceptable to LVL. That is clearly what the parties' intended, as taken from "words having common or generally accepted, ordinary meanings" that "are taken to have been so intended." <u>Motor Coils Mfg. Co. v. American Ins. Co.</u>, 308 Pa. Super. 568, 454 A.2d 1044 (1982). The "object manifestly to be accomplished" was Defendant's dismissal and release from liability in exchange for Defendant providing a billboard – not a hypothetical one, but one capable of actually being erected at the site provided, or an alternative site acceptable to LVL. Certainly, when choosing this plain language in the contract, LVL (vis a vis PA Media) was never intending to confer upon Defendant the entire benefit of the bargain to end up with nothing. Nor was LVL, when choosing this language, intending to receive a billboard at a location

*unacceptable* to it, or at a location of *Defendant's* choice and control, or at a location where it *did not want* a billboard or where one *could not receive* PennDOT permits to build and maintain. It was conferring an enormous benefit, and its receipt of same – the reasonable, natural and probable expectation of its agreement to the dismissal and release – must be the centerpiece of any interpretation of the words "location acceptable to PA Media and LVL" that were specifically written into the agreement. Otherwise, those words have no meaning, or a meaning contrary to nature and reason, in violation of the basic principles of contract interpretation.

Only a tortured construction – divorced from the context of the parties own words and the idea of what was manifestly to be accomplished through this Settlement Agreement – could arrive at any conclusion other than that expressed by the writing itself: if the permits/licenses/permissions for the Interstate 78 site failed, then the City of Easton must provide another location acceptable to PA Media and LVL at which it may erect and maintain a billboard. This is the natural interpretation of the contract's language in Sections 1, 2, and 15, which must be interpreted together in accordance. The fallacy of Defendant's argument is that if one adopts Defendant's proposed interpretation, it effectively nullifies the intent and purposes of the parties. To side with Defendant would be contrary to both the plain meaning of the phrase "location acceptable to PA Media and LVL" *and* the objects manifestly to be accomplished by the Settlement Agreement. This can be illustrated through numerous examples.

For instance, if one accepts as Defendant argues that it need not provide an alternative site acceptable to Plaintiff, then what is the purpose and intent behind *the parties' use* of the phrase "other location acceptable to Plaintiffs and LVL Co., LLC"? What effect is that language to be given? None? Defendant's interpretation requires ignorance of the parties' language in violation of basic contract interpretation principles that only serves to frustrate the clear intent of

the parties: the City gets release and dismissal, LVL gets a billboard site capable of building and maintaining a billboard. Yet, those basic contract interpretation principles preclude ignorance of this key phrase chosen by the parties.

For further instance, if one accepts as Defendant argues that it is not obligated to provide land to erect and maintain a billboard that is acceptable to LVL should permitting of the Proposed Site fail, why doesn't the Settlement Agreement say that? The agreement is just as striking for what phrases and conditions the parties did *not* choose as for those they did. Why, if Defendant did not intend the natural and plain meaning of the phrase chosen ("other location acceptable to Plaintiffs and LVL Co., LLC"), did Defendant not say so? Why wasn't the phrase written as "other location acceptable to Defendant", or "other location acceptable to both Defendant and to Plaintiffs and LVL Co., LLC". Why must Defendant ask the court to alter the language it chose in favor of words and phrases it did not? Why must Defendant ask the court to alter the language used by the parties and presumed to reflect their intent in favor of adding language or conditions that the parties never expressed an intent to include, and which may not reflect anything remotely close to what they agreed?

For yet another instance, why ignore the fact that the parties intentionally accounted for the possibility – with express language – that the Proposed Site might not be capable of serving as a location for the billboard due to licensing and permitting issues along Interstate 78? How did the parties address that? By conditioning the entire consideration for the Settlement Agreement upon Defendant providing either that Site, or if not, another location acceptable to Plaintiff. Clearly that was important, for the parties' wrote it into the contract. They could have easily left it out. They could have easily failed to account for it. They could have – but they did not, because it was important and their addressing of it carries meaning and import that

Defendant now would have the Court ignore.  It shows that they considered the possibility that they might someday be in the very situation in which they now find themselves – Defendant having secured dismissal with prejudice and release from all claims and LVL being without ability to build and maintain the billboard at the Proposed Site along Interstate 78 due to permit issue beyond the parties control.  Having contemplated this predictable scenario, *the parties addressed it* with the following added phrase "or other location acceptable to PA Media and LVL" to require the City's obligation to supply "land to erect and maintain a billboard" *to continue on* at a location acceptable to LVL.  It makes complete sense that LVL, having invested a substantial sum of money to acquire the rights to the "Easton litigation" from Abraham Atiyeh in their Asset Purchase Agreement, would want to protect that investment from failure by including this language.

For further instance, Defendant has argued that its release and dismissal from the underlying lawsuit was only conditioned upon its provision of "land to erect and maintain a billboard", and that since the condition was not met the release "never went into effect."  Under Defendant's interpretation, the very fact that it has not provided to Plaintiff said land capable of erecting and maintaining a billboard would mean that Defendant accomplished nothing by the agreement, and in fact has acted in opposition to its own interests in being released.  Further, it would mean that Defendant entered into an agreement that it knew, or had reason to know it would not or could not fulfill.  What was Defendant's purpose and intent behind the Settlement Agreement if not to secure full release from liability on all claims?  Defendant's interpretation would require the court to ignore the basic contract interpretation principle that "the court will adopt the interpretation which under all the circumstances ascribes the most reasonable, probable, and natural conduct of the parties, *bearing in mind the objects manifestly to be*

*accomplished."* Defendant's proffered interpretation – that it has withheld performance on the very condition for its own full and final release, that it has withheld in effect the keys to its escape from the jailhouse of liability on the underlying lawsuit – requires the Court to ignore the object Defendant manifestly sought to accomplish in the first place rather than interpret the contract consistent with the parties objectives in settlement.  The interpretation it proposes asks this Court to believe that Defendant has intentionally thwarted its own release by not meeting the "condition" for it, despite executing the Settlement Agreement for the express purpose of securing that release.  Such an interpretation is nonsensical and fails basic contract interpretation principles.  In fact, it implies bad faith on the part of Defendant City.  It also ignores the City's obligation under Section 2 to provide to Plaintiff "land to erect and maintain a billboard", and is contradicted by both the parties' simultaneous dismissal with prejudice of a lawsuit that cannot be reinstated and the following language in Section 3 of the agreement: "The parties agree that notwithstanding the occurrence of any event(s) subsequent to the execution of this Agreement that could be construed as a breach of this Agreement, the release set forth herein shall remain in full force and effect to release claims based on events that occurred before the execution of this Agreement."  (See Ex. "B" at Sections 2 and 3.)

Moreover, Defendant's interpretation also requires the Court to believe that Plaintiff chose self-defeating language contrary to its interests.  If, as is clear, Plaintiff's bargain was for "land to erect and maintain a billboard", (See Ex. "B" Section 2), and if as is clear the parties contemplated that the Proposed Site might not be capable of permit for a billboards along the Interstate and provided language to address that, (See Ex. "B" Section 15), why would Plaintiff agree to place its ability to secure the bargained-for benefit of the contract totally within the control of Defendant?  Defendant's interpretation that somehow it may control the alternate site

it provides (even though the contract doesn't say that) would require the Court to believe Plaintiff agreed to release Defendant and dismiss a lawsuit with prejudice in exchange for a promise of Defendant to maybe agree to provide something somewhere of Defendant's choosing. Not only does such an interpretation make jest of the principle that court shall adopt the interpretation that "ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished," but it would likewise defeat *Defendant's* goal of securing an enforceable release..

Indeed, Defendant's interpretation requires an eye toward contract-nullification, for if Defendant is conceding that Plaintiff has never, and can never, receive the benefit of the parties' bargain due to supposed illegality or impossibility, then what Defendant is asking this Court to do is to interpret the contract with an eye toward nullifying it. That too would violate core principles of contract interpretation that require exactly the opposite: a contract must be interpreted if possible to give effect to each and every part, ***and an interpretation will not be given to one part which will annul another part.*** Keystone Fabric Laminates, Inc. v. Federal Ins. Co., 407 F.2d 1353 (3d Cir. 1969); Motor Coils Mfg. Co. v. American Ins. Co., 308 Pa. Super. 568, 454 A.2d 1044 (1982). Defendant has yet to propose an interpretation of the contract that would honor the parties' intent and give compatible meaning and effect to all its parts, both its own release and dismissal as well as LVL's bargained-for billboard. Instead, Defendant's arguments undermine its own document and its own settlement through a reading designed to *undo* the words the parties expressly chose.

Perhaps the most telling, Defendant's interpretation takes for Defendant everything and leaves Plaintiff with nothing as third-party beneficiary of the deal. That, most assuredly, is not in keeping with the words and intent manifest in this Settlement Agreement and the purposes for

which, after multiple conferences with a federal magistrate judge and very public endorsements of the settlement by Defendant, the agreement was entered into.  At the end of the day, Defendant's position is that it can rob Plaintiff blind of the consideration it promised in exchange for its dismissal with prejudice from significant exposure in a pending lawsuit, without providing anything of value, whether specific performance or merely monetary compensation for the value of the "land to erect and maintain a billboard" that it has never provided..  At the end of the day, Defendant's position is that LVL paid Abraham Atiyeh a substantial sum of money to purchase the rights to nothing at all.

Defendant has no answers for these questions, and for the gaping holes in its proposed interpretation analyzed under basic principles of contract interpretation.

The Court should fashion a remedy which accomplishes what the parties wrote, intended, and that honors the plain and unambiguous words of the agreement and the spirit of the bargain, and that gives Defendant what it intended to receive while equally providing to Plaintiff the benefit of the bargain.  Plaintiff is simply asking the Court to interpret the contract in such a way as to find Defendant in breach of the Settlement Agreement and order the City to provide to Plaintiff the "other location acceptable to LVL", or in the alternative, compensate Plaintiff for its damages.  To do otherwise is to inequitably grant to Defendant a windfall of benefit and to leave Plaintiff with absolutely nothing.

## C. DEFENDANT HAS UNQUESTIONABLY BREACHED THE CONTRACT, THEREBY ENTITLING LVL TO SUMMARY JUDGMENT AS A MATTER OF LAW.

1. Defendant has breached the express terms of the Settlement Agreement requiring it to provide, as consideration for its release and dismissal from the underlying lawsuit, a billboard site acceptable to LVL upon failure of the Proposed Site.

Pursuant to the Settlement Agreement, Section 1. Dismissal, the parties stipulated to the

dismissal of the action with prejudice based upon mutual promises as set forth in the Settlement Agreement, including Easton's agreement to provide to Plaintiff *"land to erect and maintain a billboard"* and the occurrence of a condition, specifically PA Media being granted a billboard site capable of approval for a digital billboard to be located in Easton on Tax Parcel #M10 23 0310E (hereinafter "Proposed Site"), which is located next to and is visible from Interstate Route 78 Westbound, *or other billboard site/location acceptable to PA Media and LVL*. (See Exhibit "B", Sections 1, 2, and Section 15.)  Immediately after approving the Agreement by Resolution dated April 13, 2016, Easton and LVL entered into a lease agreement and addendum thereto, for the Proposed Site, which lease agreement and addendum were accepted and approved by Easton via Ordinance No 5553 dated April 27, 2016.  (See "Ordinance No.5553 with attached Lease Agreement and Addendum" attached as Exhibit "F" to the instant motion.)

The Proposed Site, it turned out, <u>cannot be legally permitted for a billboard because of applicable regulations</u> as to billboards on interstate highways such as Interstate Route 78.  (See pertinent excerpts of the "Pennsylvania Department of Transportation (PennDOT) Highway Beautification Manual PUB 581 (5-16)", at Chapter 3 "Permitted Signs", attached as Exhibit "G" to the instant motion.)  Specifically, 36 P.S. 2718.04 states: "To effectively control outdoor advertising, while recognizing it to be a legitimate commercial use of property and an integral part of the business and marketing function, no outdoor advertising device shall be erected or maintained: (1) within six hundred sixty feet of the nearest edge of the right-of-way if any part of the advertising or informative content is visible from the main-traveled way of an interstate  or primary highway, except for nine classes of sign which are exceptions to the prohibition and which are permitted."  (See Exhibit "G" at Chapter 3 "Permitted Signs".)

Chapter 3.02 Exception (V): Interstate "Kerr Area" Signs (citing 36 P.S. 2718.104(1)(v))

states an exception from application of the general ban on outdoor advertising devices along interstate highways as follows: "outdoor advertising devices in areas zoned commercial or industrial *along the interstate system and lying within the boundaries of any incorporated municipality as such boundaries existed on September 21, 1959*, and devices located in any other area which, *as of September 21, 1959*, was clearly established by law as industrial or commercial." (See Exhibit "G" at Chapter 3.02.)  Under the aforementioned regulations, a land parcel located along an interstate highway upon which it is proposed that a billboard be placed *must have been within the boundaries of the City of Easton as of September 21, 1959* in order to meet the exception for a Kerr Area – Type 1 site and thereby secure a PennDOT permit.  (See Exhibit "G" at Chapter 3.02.)

The Proposed Site in the parties' Settlement Agreement, located along and visible from Interstate Route 78, is located on a parcel of land that was not within the boundaries of Easton until *after September 21, 1959*, and accordingly does not fall within the exception for Kerr Area – Type 1 signs and cannot be issued a permit by PennDOT; that is, the Proposed Site was annexed into the City of Easton *on October 8, 1959* by Ordinance No. 1611.  (See  "Ordinance No. 1611" attached as Exhibit "H" to the instant motion.)  No other exception allows for the issuance of a PennDOT permit to erect an outdoor advertising device at the Proposed Site along Interstate 78.

By letter dated January 12, 2017, Richard Zecchino, Esq., General Counsel for Adams Outdoor Advertising L.P., an affiliate of LVL, put Defendant on notice that the Proposed Site was accordingly not acceptable to LVL and, pursuant to LVL's rights under the Agreement (those obtained through PA Media and LVL's own rights), it would be seeking a new site for approval.  (See Letter dated 01/12/17 attached as Exhibit "I" to the instant motion.)  By letter

dated February 14, 2017, Defendant's legal counsel denied LVL's assertion of a right to an alternate acceptable site pursuant to the Settlement Agreement, and moreover stated that Plaintiff has no remedy, suggesting that the dismissal with prejudice is final and Defendant would receive nothing. (See Letter dated 02/14/17 attached as Exhibit "J" to the instant motion.)

LVL identified an alternative site that would be acceptable to it and acquired the rights from the property owner, Dennis Benner, and/or the business entity controlled by him to place a billboard at 16 Centre Square in Easton on Tax Parcel #L9SE2B 511 0310 (hereinafter "the Centre Square site"). (See Doc.1, Compl. ¶14.) As an attempt to avoid litigation and seek a compromise, LVL, by and through its representatives, thereafter had discussions and met with Defendant's Mayor Salvatore Panto (hereinafter "Mayor Panto") advising him that the Centre Square site would be an acceptable alternative site to LVL and requesting the City agree to approve it given the failure of the original billboard site.. (See Doc. 1, Compl. ¶15, and Doc.24, Answer ¶15 (admitting occurrence of said discussions regarding an alternative site).) LVL, by and through its representatives, thereafter on June 27, 2017, met with Mayor Panto and City Council to propose the Centre Square site as an acceptable alternative site in lieu of the one originally provided for by the Settlement Agreement. (See Doc. 1, Compl. ¶16, and Doc.24, Answer ¶16 (admitting the occurrence of said meeting).) Defendant, by and through its Mayor and City Council, rejected Centre Square as an acceptable alternative site.. (See Doc. 1, Compl. ¶17.)

In January 2018, Defendant offered other billboard site/locations to LVL; however none of the proposed sites are acceptable to LVL for various reasons including failures to comply with applicable regulations. (See Doc.1, Compl. ¶21, and Doc.24, Answer at ¶21 (admitting Defendant's proposal of other billboard sites for LVL).) On May 2, 2018, in a further attempt to

avoid litigation, LVL, by and through its representatives, again sought a potential resolution of this matter with Defendant by meeting with Mayor Panto.  (See Doc.1, Compl. ¶22, and Doc.24, Answer ¶22 (admitted).)  At the May 2, 2018 meeting, LVL again sought approval of the Centre Square site or another acceptable location.  (See Doc.1, Compl. ¶23, and Doc.24, Answer ¶23 (admitted).)  ***Thereafter, Mayor and Counsel advised LVL that Defendant will not accept the Centre Square site and did not offer to provide any other potential location(s).***  (See Doc.1, Compl. ¶24, and Doc.24, Answer ¶24 (admitted).)  In other words, Defendant failed to offer to Plaintiff any other land upon which to erect and maintain a billboard acceptable to Plaintiff, in violation of the express terms of the Settlement Agreement.

Defendant has failed to provide to LVL another billboard site/location acceptable to LVL which is compatible to LVL in terms of aesthetics and economics to the identified site in the Settlement Agreement that could not be permitted or to the Centre Square site requested by Plaintiff.  Moreover, Defendant has appeared at hearings and opposed LVL's permit application for an alternative site acceptable to it, thereby further obstructing LVL's receipt of a billboard in the City in violation of Defendant's implied duty to perform its agreement with LVL in good faith. On September 11, 2018, LVL submitted a permit application to the City of Easton to erect a proposed sign at 16 Centre Square, Easton, PA 18042, which was subsequently denied by Defendant City of Easton.  (See "Application for A Permit to Erect a Sign" attached as Exhibit "K" to the instant motion.)  LVL appealed the denial of the permit application to City of Easton Zoning Hearing Board on October 9, 2018.  (See "City of Easton Zoning Application Permit Denial" attached as Exhibit "L" to the instant motion.)  Public hearings were held on LVL's application/appeal, following public advertising and notice of same, before the City of Easton Zoning Hearing Board over four successive months, on January 22, 2019, February 19, 2019,

March 18, 2019, and April 17, 2019. (See "Notice of Land Use Appeal" attached as Exhibit "M" to the instant motion, at p.137 "Legal Notice of Zoning Hearing" and pp.145-46 "Notice of Decision" at subject line and finding of fact (2).) At the advertised public hearings, members of the public had notice and an opportunity to be heard. (See Id.) Defendant City of Easton appeared at the hearings and opposed LVL's application/appeal seeking approval of the Centre Square site, including Mayor Panto speaking against the request. (See Id. at p.153 finding (22) and p.168 finding (47)("the Objector, City of Easton").)

On or about September 25, 2019, LVL appealed the Zoning Hearing Board's denial of its application/appeal to place the billboard at the Centre Square site to the Northampton County Court of Common Pleas. (See Exhibit "M".) Defendant City of Easton has intervened in the appeal before the Court of Common Pleas in support of the denial of LVL's acceptable alternative site, i.e., the Centre Square site. (See "Notice of Intervention" attached as Exhibit "N" to the instant motion.) No other person – including no objectors/protestants or any member of the public – has intervened in LVL's appeal. Thus, while failing to perform – i.e., failing to provide to LVL land upon which to erect and maintain a billboard that is acceptable to it in lieu of the Proposed Site which failed – Defendant has simultaneously opposed LVL's attempts to otherwise realize the benefit of its bargain through a petition process.

Thus, should the Court as urged adopt Plaintiff's interpretation of the Settlement Agreement as argued extensively above, Defendant's breach is indisputable as Defendant has failed to provide to Plaintiff land to erect and maintain a billboard, either at the original Proposed Site or at an "other location acceptable to PA Media and LVL" as called for by the parties' Settlement Agreement upon discovery that the Proposed Site cannot be permitted for a billboard. (See Ex. "B", Sections 2 and 15.) Simply put, the answer to the question "what benefit of the

bargain has LVL received?" is "nothing."  At the end of the day, neither PA Media nor LVL, who owns the assets of PA Media, has received the billboard site in accordance with the contract. Even more, Defendant has actively opposed and intentionally withheld an alternative site acceptable to Plaintiff..  Accordingly, there exists no genuine issue of material fact as to Defendant's breach of contract.

2.  <u>Defendant has breached its duty of good faith performance of the Settlement Agreement.</u>

The Settlement Agreement inherently requires Defendant to take all actions within its control to ensure that LVL secures a billboard site/location acceptable to it.  That is, Defendant has a well-established, good-faith duty to take all necessary steps to perform on its contractual obligations under the Agreement to provide to LVL a lease of land to erect and maintain a billboard.

Pennsylvania has adopted the principle in Restatement (Second) of Contracts §205 that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." <u>Stamerro v. Stamerro</u>, 889 A.2d 1251, 1259 (Pa. Super. 2005); <u>Donahue v. Federal Express Corp.</u>, 753 A.2d 238, 242 (Pa. Super. 2000).  A duty of good faith and fair dealing may arise either under an express contractual provision or under the Pennsylvania doctrine of "necessary implication" where there is no express obligation in the contract. <u>Hurst v. Beck</u>, Civ. A. No. 91-2492, 1992 WL 396592 at  *7 (E.D. Pa. Dec. 17, 1992)(<u>citing</u> <u>Sommers v. Somers</u>, 613 A.2d 1211, 1214 (Pa. Super. 1992)).  The law implies such an agreement ***to effectuate the benefits of the parties' bargain***. <u>Id.</u> at *7.

Courts employ the doctrine of necessary implication as a means of avoiding injustice by inferring contract provisions that reflect the parties' silent intent. <u>Palmieri v. Partridge</u>, 853 A.2d 1076, 1079 (Pa. Super. 2004).  The doctrine states:

In the absence of an express provision, the law will imply an agreement by the parties to a contract *to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.*

Id. (quoting Somers, 613 A.2d at 1214)(emphasis added).

In Frickert, one of the owners of a corporation failed to perform his contract "according to reason and justice" when he transferred his shares to his sons during his lifetime when it was the contract's intent to ensure that other employees would succeed to ownership in equal shares. Frickert v. Deiter Bros. Fuel Co., Inc., 347 A.2d 701 (1975). The Court found that while intervivos transfer of the shares was not expressly prohibited in the contract, such a transfer *frustrated the intent of the parties* and violated the implied duty of good faith. Id.

Similarly, in Somers, the plaintiff entered into a consulting contract with a corporation providing for 50% of the profits realized from a particular project. Somers, 613 A.2d at 1212. In order for the profits to be realized, it was necessary for the corporation to resolve a third-party claim. Id. Somers alleged the corporation breached their consulting agreement when it settled the claim for significantly less than it was owed so as to deprive him of his fair share of the profits related to the project. Id. The Court concluded that Somers should have an opportunity to establish that the corporation acted in bad faith and reversed the trial court's order dismissing the case for failure to state a claim. Id. at 1213-16. A claim for breach of contract, it held, was stated by Somers based on the implied duty of good faith performance in all contracts. Id. at 1216.

By way of the Settlement Agreement here, Defendant was released from a lawsuit exposing it to substantial damages and costs. Defendant received a substantial benefit, and the consideration for that release was simple: provide the Proposed Site for a billboard or, should the

permitting of that site fail, an alternative location acceptable to PA Media and LVL. To date, Defendant has reaped the entire benefit of this contract while frustrating and altogether eliminating the consideration for the release and dismissal with prejudice. That is, neither PA Media nor LVL, who owns the assets of PA Media, has received the billboard site in accordance with the contract. The Proposed Site having failed the express condition of the Settlement Agreement of being capable of securing the necessary permits, LVL has nothing, while Defendant exclusively enjoys the entire benefit of the bargain without providing anything of value. Defendant's position seems to be that the situation is irreversible and <u>without remedy</u>, because this Court dismissed the underlying lawsuit with prejudice after the parties reached settlement.

The Settlement Agreement does not allow Defendant to unilaterally cancel and destroy the consideration for the contract without remedy or relief for LVL. Rather, consistent with the implied duty of good faith performance discussed above – **which operates by law to prevent just such an injustice** – the Settlement Agreement inherently imposes a duty upon Defendant to take all actions within in its power and control to ensure that LVL is provided with a billboard site/location acceptable to it. That is what the contract calls for, both expressly and impliedly in good faith.

Defendant's actions in failing to accept Centre Square as LVL's alternatively acceptable billboard site/location, or to offer another billboard site/location acceptable to LVL which is compatible to LVL in terms of aesthetics and economics to the identified site in the Settlement Agreement, violates its contractual duty of good faith performance. Defendant, very clearly, is "cherry-picking" the provisions of a contract that it will benefit from – its release from all claims and dismissal of the underlying lawsuit – while ignoring other provisions that don't benefit it or

that it would prefer not to be governed by, to the point of eliminating the very consideration it gave in exchange for said release and dismissal. See Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 85 (3d Cir. 2010)(noting practice of "cherry-picking" in discouraged in contract law); Griswold v. Coventry First LLC, 762 F.3d 264, 272 (3d Cir. 2014)(cherry-picking which contractual provisions a party will enjoy while failing to perform others discouraged under the law). Defendant attempts to shield itself behind the dismissal with prejudice of the underlying lawsuit that it secured via the very Settlement Agreement it now thumbs its nose at, suggesting that it be allowed to reap the full benefit of its bargain with Plaintiff – its release from a devastating lawsuit – while withholding its performance to deny the Settlement Agreement's clear and intended consideration: the Proposed Site if capable of securing the necessary permits, or failing that an alternative location acceptable to Plaintiff.

Yet, evasion of the spirit of the bargain is one recognized form of bad faith performance that establishes breach of contract, and this Court should not condone Defendant's attempt to escape its obligations without recourse. Stamerro, 889 A.2d at 1259; Somers, 613 A.2d at 1213. The doctrine of necessary implication here implies an agreement by Defendant "to do and perform those things that according to reason and justice it should do to carry out the purpose for which the contract was made", namely providing LVL with a billboard site that is acceptable to it (as called for by the terms of the contract) where the original Proposed Site cannot be legally permitted.

The doctrine also implies an agreement by Defendant "to refrain from doing anything that would destroy or injure LVL's right to receive the fruits of the contract." The fruit of the contract, and indeed the only fruit that was negotiated and established as consideration for Defendant's release from the lawsuit, was provision of LVL's billboard site. The Settlement

Agreement set forth a Proposed Site, conditioned upon permitting, and establishes that should said permitting fail Defendant would provide another site acceptable to LVL. (Compl. ¶9 and Ex. A, Section 15, Page 8.)  Defendant has acted in complete frustration and refusal of this consideration, withholding performance against all reason and justice so as to destroy the fruit of the deal for LVL, leaving it with nothing.  Worse, while offering no other acceptable site Defendant has aggressively opposed Plaintiff's application to erect a sign at an alternate location Plaintiff believes acceptable, going so far as to appear and actively voice opposition through Defendant's Mayor and Solicitor, and has intervened in Plaintiff's appeal from the denial of its request to erect the sign by Defendant's Zoning Hearing Board.  (See Ex. "M" at p.153 finding (22) and p.168 finding (47)("the Objector, City of Easton"); See also Ex. "N".)  Thus, not only has Defendant passively frustrated the intent and performance of the Settlement Agreement, but Defendant has taken repeated, active steps to oppose Plaintiff's otherwise obtaining the billboard.  Defendant's conduct is the hallmark of bad faith.  On the one hand it takes based on a promise to give, and on the other it withholds what it promised to give and opposes giving it at all cost, leaving LVL with nothing.  Such conduct borders on maliciousness and theft, let alone bad faith performance.

Accordingly, Defendant has also breached the implied duty of good faith performance inherent in the Settlement Agreement and LVL is entitled to judgment as a matter of law with the right to specific performance and/or damages.

## D. DEFENDANT'S PERFORMANCE OF THE SETTLEMENT AGREEMENT IS NEITHER ILLEGAL NOR IMPOSSIBLE AS THE AGREEMENT SUPERSEDES STATE ZONING LAWS UNDER WELL-ESTABLISHED CASE LAW ENCOURAGING THE SETTLEMENT OF PENDING LITIGATION.

Defendant's argument that its good faith performance of the Settlement Agreement would violate state zoning laws prohibiting spot- and contract-zoning is unavailing in the face of

well-recognized precedent to the contrary.  Defendant was authorized by law to settle its pending lawsuit with PA Media by agreeing to provide Plaintiff with a billboard site in the City in a manner and place inconsistent with its zoning ordinance, and said settlement agreement is a legally enforceable contract.

First and foremost, if not already clear, Plaintiff is not contending that it has the right to place a billboard anywhere it wants in any manner it wants under the Settlement Agreement. That is a fundamental misreading of Plaintiff's claim.  Plaintiff has contended, and is contending, that the parties' Settlement Agreement calls for Defendant to provide "land to erect and maintain a billboard", in Section 2, and Defendant has not done that.  Plaintiff is contending that when read in conjunction with Section 2, Section 15 specifies that the land Defendant was to provide for the building and maintenance of the billboard was at a specifically identified site, if capable of securing permits, or at another location acceptable to LVL.  Recognizing the Proposed Site could not be permitted under applicable PennDOT regulations, Defendant's obligation to provide land to erect and maintain a billboard became at an "other location acceptable to PA Media and LVL Co., LLC," and Defendant has not done that either.  Plaintiff has not suggested it gets carte blanche to do whatever it wants in the City of Easton, as Defendant implies, making Defendant's spot-zoning argument somewhat unnecessary.

Nor is Plaintiff contending that the only form of relief available is an order granting specific performance at a particular location.  In Argument section E, below, Plaintiff makes clear with citation to applicable law that ***monetary damages for the value of the billboard site*** Defendant has never provided in accordance with the Settlement Agreement is likely the most appropriate measure of damages in this case, but may be determined at a hearing affixing the appropriate form of relief.  Defendant's spot-zoning arguments thus fundamentally rest on

incorrect factual premises and assumption about what Plaintiff is arguing and the forms of relief available for the Court to award should it find that Defendant promised and failed to deliver a billboard site.

As for the law, it is well-established that a municipality may resolve a pending lawsuit by settlement agreement without amending its zoning ordinance, and that such a settlement ***does not constitute illegal spot- or contract-zoning, nor does it constitute an improper zoning ordinance amendment***. Simply put, "the law favors settlement" and therefore court-approved settlement of pending litigation is lawful. Boeing Co. v. Zoning Hearing Bd. of Ridley Twp., 322 A.2d 153, 161 (Pa.Cmwlth. 2012).   In fact, resolution of pending litigation by settlement agreements has been repeatedly upheld even where such agreements permit a departure from existing zoning requirements. BPG Real Estate Investors –Straw Party II, L.P. v. Board of Supervisors of Newtown Twp., 990 A.2d 140 (2010); See e.g., Yaracs v. Summit Acad., 845 A.2d 203 (Pa.Cmwlth 2004); Boeing Co., 322 A.2d 153; Summit Twp. Taxpayers Ass'n v. Summit Twp. Bd. of Supervisors, 411 A.2d 1263 (Pa.Cmwlth 1980); Council of Borough of Monroeville v. Al Monzo Contr. Co., 289 A.2d 496 (Pa.Cmwlth 1972).   Such settlements are distinct from zoning hearing board variances, and even though a settlement agreement may result in a departure from the ordained zoning pattern, that kind of departure (i.e., one accomplished by settling a pending lawsuit) does not fall within a zoning board's jurisdiction. BPG Real Estate Investors, 990 A.2d at 147-48; Summit Twp. Taxpayers Ass'n, 411 A.2d at 1266.  The contract and spot-zoning jurisprudence of the Pennsylvania Supreme Court has thus been held inapplicable to the settlement of pending litigation affecting land use. BPG Real Estate Investors, 990 A.2d at 147-148; In re Appeal of Main Street at Exton, L.P., No. 1507 C.D. 2009, 2010 WL 9513562 at n.6 (Sep. 9, 2010)("An agreement entered into to resolve the ongoing litigation, such as the

Settlement Agreement in this case, does not constitute invalid contract zoning, even if it permits deviations from the ordinance requirements."). Where a court approves a settlement that resolves original litigation and is in accordance with the law, there is no abuse of discretion. BPG Real Estate Investors, 990 A.2d at 149.

In Boeing, the Boeing Company challenged the validity of actions taken by Ridley Township to resolve a number of pending lawsuits by settlement agreements. 822 A.2d at 154. Boeing alleged that the Township engaged in illegal spot zoning and contract zoning by settling the lawsuits in a manner that allowed an adult entertainment facility a non-conforming use, dispensed with any requirement to obtain a special exception, and exempted it from the provisions of the zoning ordinance related to adult entertainment facilities. Id. at 158. Boeing further alleged that the Township had in effect amended its zoning ordinance in violation of the procedural requirements of the Pennsylvania Municipal Planning Code. Id. On appeal to the Commonwealth Court of Pennsylvania, the Court rejected those arguments, observing that *judicially-approved settlements of pending litigation may permissibly result in a departure from an ordained zoning pattern*. Id. at 161. The settlement negotiations in Boeing occurred under the supervision of the presiding judge in the federal case, and the terms of the finalized settlement agreement were put to a vote at the township meeting and unanimously approved. Id. at 156-57.

Here, as in Boeing, the Settlement Agreement was the culmination of months of settlement discussions brokered by this Court and Magistrate Judge Marilyn Heffley on Civil Docket No. 5:14-cv-04707-EGS. (See Ex. "C".) The docket reflects Defendant's participation in no less than four settlement conferences, including on March 6, 2015, March 10, 2015, March 12, 2015, and March 23, 2015, after which several status conferences were held as the parties

negotiated settlement through December 2015. (Id.) The docket further reflects that the Court thereafter dismissed the underlying lawsuit with prejudice based on the parties' representation that they had reached settlement and would be finalizing the written Settlement Agreement. (Id.) As in Boeing, the finalized Settlement Agreement was put to vote and approved by Resolution at a public meeting on April 13, 2016. (See Ex. "B" and Ex. "E".) The Resolution was unanimously approved at the public meeting following extensive discussion. (See Ex. "D" and "E".) During those discussions, Defendant's Mayor stated on the record that the Settlement Agreement was agreed to at a hearing with the Federal Judge (Ex. "D" at p.6). A Councilman represented that Defendant's City Council traveled to Federal Court, sat and discussed the issue, and that the Resolution adopting the Settlement Agreement was the most efficient way of resolving the matter. (Ex "D" at p.7.) Another Councilman shared on the record that "the Federal District Judge was very much on board with this settlement." (Id.) Under these facts and circumstances, and in light of the case law discussed above, Defendant's claim that it cannot perform in good faith because to do so would violate state zoning laws is utterly without merit. Defendant's provision of a billboard site acceptable to LVL should the Proposed Site be incapable of receiving its permits – i.e., the very consideration provided in the Settlement Agreement for Defendant's release from and dismissal of all claims to which it was exposed – is clearly not illegal, nor is its performance impossible.

Moreover, the Settlement Agreement does not involve a zoning reclassification, but rather simply relates to Plaintiff's placement of a sign in an area where signage is permitted, such that factually, in addition to legally, the case law concerning spot- and contract-zoning is wholly inapplicable. See e.g., Yaracs, 845 A.2d 203 (settlement agreement allowed landowner to expand its legal nonconforming use); Boeing Co., 322 A.2d 153 (settlement agreement permitted

a special exception to operate an adult entertainment facility); <u>Summit Twp. Taxpayers Ass'n</u>, 411 A.2d 1263 (settlement agreement allowed landowner to expand its legal nonconforming use).

Defendant may attempt once again to distinguish this case from those in which Pennsylvania courts have repeatedly stated that settlements of pending litigation do not constitute illegal spot- or contract-zoning, by claiming that the underlying action here was not "a land use case" like those. Said distinction puts form over substance and denies the facts. Defendant makes an unjustifiably narrow reading of the cases cited above by suggesting that it is the form of the underlying cause of action – in this case PA Media's First and Fourteenth Amendment claims in the underlying action against Easton rather than a zoning appeal – that drives the favorability of settlements, arguing that the form of action dictates whether settlement agreements can be used to settle land disputes. The cases do not say that. In fact, as pointed out above, the settlement negotiations in <u>Boeing</u> occurred under the supervision of the presiding judge <u>*in a federal case*</u>, and the terms of the finalized settlement agreement were put to a vote at the township meeting and unanimously approved, leading the Pennsylvania Commonwealth Court to uphold the settlement versus a challenge of illegal zoning. 822 A.2d at 156-57.

The cases cited by Plaintiff are absolutely on point in as much as Defendant agreed to settle a lawsuit over its refusal to lease property in a specific area by granting a lease of property at that precise location or, if not legally capable of securing a permit, in another location acceptable to PA Media and LVL. Defendant does not dispute that the Settlement Agreement was used to settle an underlying lawsuit over Defendant's refusal to lease property in a specific location within the City of Easton – ***i.e., a land use dispute*** – albeit it one brought federally under the First and Fourteenth Amendments. (See Ex. "O", "Complaint" (doc.1) in Civil Docket

No. 5:14-cv-04707-EGS, in conjunction with Ex. "B", demonstrating same.) Defendant has further conceded in a previous filing that the Settlement Agreement resolved this underlying land dispute between PA Media and Defendant by requiring the City of Easton to enter into an agreement with PA Media or Plaintiff "for the lease of property within the specific parcel of land" in the specific location that was the subject of PA Media's lawsuit. (See doc.10 at p.8.) In other words, Defendant does not dispute that the underlying lawsuit concerned Defendant's refusal to lease land to Plaintiff which was resolved in Plaintiff's favor by Defendant's leasing land at the subject location. Defendant now refuses to honor both the letter and spirit of the Settlement Agreement it made when it negotiated with PA Media/Plaintiff *and agreed to include the express language at issue here, "or other billboard site/location acceptable to PA Media and LVL",* to provide for consideration to support the contract should Plaintiff be unable to legally secure permits for the identified site. (See Ex. "B", Sections 1, 2, and 15.) This clause was not put in for no reason at all; it cannot be taken as superfluous or unintended. It was specifically negotiated and agreed upon in order to provide Plaintiff with the consideration intended should the site be unable to be legally permitted for a billboard, so that the consideration would not fail and the dismissal of the lawsuit against Defendant remain unimpacted. This Agreement was well within the authority and power of Defendant to make to settle a federal lawsuit over, yes, a land dispute. Accordingly, the distinction Defendant attempts to draw from the state cases based on the form of action is unavailing.

Finally, even were the Settlement Agreement in this matter to be viewed as "de facto" spot-zoning, *a challenger to* Defendant's action in settling the underlying lawsuit would have the burden to prove that the Settlement Agreement constitutes an "unreasonable or arbitrary classification of a small parcel of land, dissected or set apart from surrounding properties, with

no reasonable basis for the differential zoning."[2] BPG Real Estate Investors, 990 A.2d at 150

(citing Christman v. Zoning Hearing Bd. of Twp. Of Windsor, 854 A.2d 629, 634-35

(Pa.Cmwlth. 2004)).  The challenging party would also have the burden of proving that, in

addition to being unreasonable and arbitrary, the Settlement Agreement "has no relation to the

public health, safety, morals, and general welfare."[3]  Id.  Given that the law favors settlements,

and that such settlements obviously benefit the general public by reducing the tax-burden of

litigation costs and the City's exposure to significant potential damages, such collateral attack

upon the settlement of a federal lawsuit will rarely, if ever, meet this burden.  See Id. at 151.  It

certainly was not unreasonable and arbitrary for Defendant to resolve a lawsuit in which it was

exposed to paying substantial damages.  Nor was its decision to shield itself and its taxpayers

from unnecessary expense unrelated to the general welfare of the public, and in fact it rendered a

direct benefit to the City of Easton as a whole.  Indeed, in reviewing a settlement agreement, the

paramount issue is whether the agreement is in the public's interest.  BPG Real Estate Investors,

990 A.2d at 150-51.  Here, no less than four settlement conferences were held by this Court, in

addition to several other status conferences, as the parties reached a settlement that the City

clearly believed was in its residents' best interests.  (See Ex. "D" p.6 where Mayor Panto says

"this is a fair settlement".)  The Settlement Agreement was debated and voted upon at a public

meeting, and unanimously approved in the public's presence.  (See Ex. "D" at pp.6-7.)

Accordingly, not only did Defendant have the legal authority to settle a pending lawsuit in a

---

[2] It should be lost on no one that the only challenger to Defendant's action of settling the underlying lawsuit through the Settlement Agreement is Defendant itself.  Indeed, not a single person has intervened in Plaintiff's Land Use Appeal other than Defendant, who, twistedly, has intervened to oppose Plaintiff's realization of the very consideration Defendant promised for its release.  (See Ex. "N".)

[3] In other words, Defendant would, in this bizarre hypothetical, have to argue that Defendant itself acted unreasonably and arbitrarily in settling the underlying litigation, and that it acted against the health, safety, morals and welfare of its own residents when it negotiated, unanimously approved, and extolled the virtues of the Settlement Agreement.  (See Ex. "D" and Ex. "E".)  The unseemly nature of such a scenario speaks for itself.

manner inconsistent with its zoning laws, but any challenger to the provisions of the settlement would never be able to meet its burden to overturn it.

Defendant's argument ignores its own hypothetical nature and asks the Court to render findings based on conjecture rather than the record at summary judgment. Nothing within the record – the sum total of the proper scope of review here – suggests that the parties' Settlement Agreement calls for illegal sport zoning if enforced. There is nothing in the record to suggest that the agreement "has no relation to the public health, safety, morals, and general welfare" of the City of Easton, nor that Defendant's entry into it by unanimous vote at a public meeting in which it publicly represented the advisability of the agreement following four settlement conferences was "unreasonable and arbitrary." Indeed, the situation as proven by the record is quite the opposite and conclusively demonstrates its decision does not, as a matter of law, constitute illegal spot-zoning under applicable case law. Defendant assumes the role of a hypothetical zoning challenger, and therefore must assume the burden that the challenger would face. Even putting aside the unseemliness of Defendant assuming such a purely hypothetical role of a non-existent zoning challenger to undermine the express language of the Settlement Agreement to which it agreed and unanimously approved, Defendant could never meet that burden (even hypothetically).

Moreover, practically, there is no party legally challenging the provision of the alternative site LVL has proposed other than the City itself. That is, on September 11, 2018, LVL submitted a permit application to the City of Easton to erect its proposed sign at 16 Centre Square, Easton, PA 18042, which was subsequently denied by Defendant City of Easton. (See "Application for A Permit to Erect a Sign" attached as Exhibit "K" to the instant motion.) LVL appealed the denial of the permit application to City of Easton Zoning Hearing Board on October

9, 2018.  (See "City of Easton Zoning Application Permit Denial" attached as Exhibit "L" to the instant motion.)  *Public hearings* were held on LVL's application/appeal, following public advertising and notice of same, before the City of Easton Zoning Hearing Board over four successive months, on January 22, 2019, February 19, 2019, March 18, 2019, and April 17, 2019.  (See "Notice of Land Use Appeal" attached as Exhibit "M" to the instant motion, at p.137 "Legal Notice of Zoning Hearing" and pp.145-46 "Notice of Decision" at subject line and finding of fact (2).)  At the *advertised public hearings, members of the public had notice and an opportunity to be heard.*  (See Id.)  Defendant City of Easton appeared at the hearings and opposed LVL's application/appeal seeking approval of the Centre Square site, including Mayor Panto speaking against the request.  (See Id. at p.153 finding (22) and p.168 finding (47)("the Objector, City of Easton").)

On or about September 25, 2019, LVL appealed the Zoning Hearing Board's denial of its application/appeal to place the billboard at the Centre Square site to the Northampton County Court of Common Pleas.  (See Exhibit "M".)  Defendant City of Easton has intervened in the appeal before the Court of Common Pleas in support of the denial of LVL's acceptable alternative site, i.e., the Centre Square site.  (See "Notice of Intervention" attached as Exhibit "N" to the instant motion.)  *Only the Defendant City of Easton has intervened* in the appeal before the Court of Common Pleas in support of the denial of LVL's proposed Centre Square site..

Defendant's anticipated reliance upon the case of Miravich v. Twp. of Executer, which it cited in support of its earlier 12(b)(6) motion, is without merit as that case is patently distinguishable.  In Miravich, the Commonwealth Court was concerned with the use of a contract as a substitute for legislation to change zoning classifications.  54 A.3d 106, 112.  The Court

distinguished the facts in Miravich from the plethora of cases approving of settlements that allow

non-conforming uses and finding that such settlements do not constitute illegal contract-zoning,

stating:

> "The Settlement Agreement changed the zoning classification for the Property
> from suburban residential back to low-density residential. The Settlement
> Agreement enables Landowner to use his Property for low-density residential, yet
> other property owners in the same zoning classification are prohibited from doing
> so. *Conversely, the settlement agreements in Yaracs, Boeing, and Summit did
> not involve zoning reclassifications. See, e.g., Yaracs (settlement agreement
> allowed landowner to expand its legal nonconforming use as a residential
> juvenile correction facility); Boeing (settlement agreement permitted a special
> exception to operate an adult entertainment facility in an industrial area);
> Summit (settlement agreement allowed landowner to expand its legal
> nonconforming use as a sanitary landfill).* We, therefore, conclude that the
> Settlement Agreement agreed to by the Township and Landowner is invalid."

Id. (emphasis added).  Here, the Settlement Agreement does not effectuate an extra-legislative

zoning reclassification but rather at most implicates Defendant's provision or allowance of the

types of use-variances and special exceptions Miravich expressly observed have been routinely

approved of in the other cases.  Moreover, unlike in Miravich where the settlement agreement

was never publically presented or debated, Id. at 111, Defendant here accepted and approved the

Settlement Agreement by Resolution at a public meeting following extensive public discussion

thereof on April 13, 2016, just like the Settlement Agreement upheld in Boeing.  822 A.2d at

156-57, 161 (finding no illegal zoning where settlement agreement was result of settlement

negotiations presided over by federal judge and the finalized agreement was put to vote and

approved at a public meeting); (See also Ex. "D", and Ex. "E").  Thus, the public has twice had

notice and an opportunity to be heard with respect to the deal struck by the City of Easton, first

when the Settlement Agreement was publically debated and voted upon, and then again when

Plaintiff's application for a proposed alternative site in Centre Square was heard at advertised

public hearings before the Zoning Hearing Board.  (See Ex. "M", "Notice of Land Use Appeal"

at p.137 ("Legal Notice of Zoning Hearing") and pp.145-46 ("Notice of Decision" at subject line and finding of fact 2).)  This is not a case, therefore, where two parties struck a deal in the dark. The parties here settled Defendant's massive exposure to an underlying lawsuit publically, discussed it publically, voted upon it publically, trumpeted its merits publically, and agreed to what they agreed.  This is simply a case of one party no longer wanting to do what it agreed to do.  Accordingly, the Miravich case is eminently distinguishable and has little persuasive value.

Finally, Defendant's argument ignores the fact it can settle _this_ lawsuit, as well, without running afoul of state zoning laws.  There is no question that in settling the instant lawsuit Defendant would be settling a land dispute in pending litigation with respect to its failure to provide a billboard site for a billboard to be erected by providing a billboard at a specific site after public notice and an opportunity to be heard.  Resolving _this_ case, like the underlying lawsuit before it, is not, under the case law review above, illegal or impossible nor detrimental to the welfare of the public who has now twice been heard on these issues once in 2016 and again in 2019.  Thus, Defendant's argument that it cannot perform the parties' Settlement Agreement by providing Plaintiff with land upon which to erect and maintain a billboard at an alternative site acceptable to Plaintiff , without running afoul of state zoning laws, is of little to no weight.

As LVL is entitled to relief in the form of monetary damages for the value of the promised billboard site it has never received in lieu of specific performance, Defendant's "illegal zoning" argument is superfluous and need not even be addressed.

## E.  PLAINTIFF HAS SUFFERED INJURY IN THE FORM OF ITS EXPECTATION DAMAGES DUE TO DEFENDANT'S FAILURE TO PERFORM, THE AMOUNT OF WHICH MAY BE DETERMINED AT A DAMAGES HEARING FOLLOWING SUMMARY JUDGMENT AS TO LIABILITY ONLY.

The third and final element of Plaintiff's breach of contract claim, that Plaintiff has been damaged by the breach, is evident as a matter of law as Defendant has failed to provide the

promised consideration for the Settlement Agreement of a lease of land to erect and maintain a billboard at the Proposed Site, if capable of securing applicable permits, or "other location acceptable to LVL". At the end of the day, neither PA Media nor LVL, who owns the assets of PA Media, has received a billboard site in accordance with the contract. Defendant received its benefit of the bargain – dismissal with prejudice from the underlying lawsuit with a full and final release – while LVL has not received the benefit of its bargain. Accordingly, LVL may seek an assessment of expectation damages and/or specific performance under the Settlement Agreement's remedies clause and well-established law, with the Court having discretion to deny specific performance in favor of awarding instead the value of the bargain Plaintiff never received.

Section 9 of the parties' Settlement Agreement ("Breach of Agreement") states as follows:

> "The parties agree that the failure to abide by any of the terms of this Agreement shall give rise to a claim *for injunctive relief and/or damages* for violation of this Agreement and the release contained herein shall not bar such a claim."

(See Ex. "B", Section 9.) Plaintiff's Complaint specified that Plaintiff is seeking just such relief in the alternative: either compensatory damages or in the alternative specific performance requiring Defendant to take all steps within its power for Plaintiff's alternative acceptable site to be approved and built. (See Doc. 1, Compl. ¶36.) Accordingly, the Settlement Agreement specifies the agreed upon forms of relief Plaintiff is here seeking in the event of breach: injunctive relief and/or damages. Moreover, both are available under the law.

Should the Court grant summary judgment on the issue of liability, the Court may fashion a monetary remedy for the value of the consideration Plaintiff never received in lieu of requiring Defendant to provide a specific site. In other words, contrary to what Defendant would have this

Court believe, a finding of liability does not automatically equate to a billboard being granted at a particular site of Plaintiff's choosing.  Rather, where a plaintiff seeks damages for the violation of a contract, the measure of its damages is not what it suffered by performing its part, but what it has suffered as a result of the defendant's failure to perform.  Jaffe v. Alliance Metal Co., 337 Pa. 449, 12 A.2d 13 (1940).  Remedies for breach of contract are designed to protect a party's *expectation interest*, by attempting to put him in as good a position as he would have been had there been no breach.  Pennsylvania Dept. of Transp. V. James D. Morrissey, Inc. For and on Behalf of W.P. Dickerson and Son, Inc., 682 A.2d 9 (Pa. Cmwlth. 1996).  Expectation damages are the "preferred basis for contract damages" and seek to give the injured party the benefit of its bargain by attempting to place the aggrieved in as good a position as it would have been had the contract been performed.  ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669 (3d Cir. 1998); Trosky v. Civil Service Comm'n, 539 Pa. 356, 652 A.2d 813, 817 (1995).  Expectation damages are measured by "the losses caused and gains prevented by defendant's breach", less any savings or other benefits from the defendant's non-performance.  Id.; see also Fishkin v. Susquehanna Partners, G.P., Civ. No. 03-3766, 2007 WL 560703 at *3 (E.D. Pa. Feb. 12, 2007); Toys R' Us-Penn Inc. v. Discovery Zone, Inc., No. Civ. A. 95-2534, 1996 WL 47980 at *3-4 (E.D. Pa. Feb. 6, 1996)("in most cases, damages to remedy breach of contract are generally measured by the loss of economic expectancy the non-breaching party suffers as a result of the failure of performance plus any so-called incidental or consequential losses, minus any expenses saved.")(citing Coca-Cola Bottling Co. v. Coca-Cola Co., 988 F.2d 386, 409 (3d Cir. 1993)).  A plaintiff can likewise recover profits that would have resulted from performance of a contract when their amount and the fact that they have been prevented by the breach of the defendant can be proved with reasonable certainty.  Clyde Coal Co. v. Pittsburg & L.E.R. Co.,

226 Pa. 391, 75 A. 596 (1910).

In this case, Plaintiff's expectation damages are that amount that would "put it in as good a position as it would have been had there been no breach", i.e., the position it would have been in had it either been permitted to erect and maintain a billboard at the original Proposed Site or at the "other location acceptable to LVL." The value of the billboard that would have been erected and maintained but for Defendant's non-performance constitutes "the losses caused and gains prevented" by the non-performance. Should this Court grant Plaintiff summary judgment on the issue of Defendant's liability, Plaintiff will be prepared at a hearing on damages to present evidence as to that expectation value. Specifically, Plaintiff will show at a hearing to affix damages the revenue for a double-sided electronic LED Digital Billboard to be located at the original Proposed Site on the westbound lanes of Interstate Route 78 – based on its size, type and location –over the life of the lease Defendant promised.

Alternatively, specific performance may be available if the Court finds that monetary damages are inadequate. Whether specific performance might be justified in a breach of contract case is within the sound discretion of the trial court, and must turn upon the particular facts presented to the court, and upon its weighing of the equities in the specific situation presented. Petry v. Tanglwood Lakes, Inc., 514 Pa. 51, 57, 522 A.2d 1053, 1055-56 (1987). Equitable jurisdiction to grant specific performance depends upon the inadequacy of the remedy at law. Id. Specific performance should only be granted where the facts clearly establish the plaintiff's right thereto, where no adequate remedy at law exists, and where justice requires it. Clark v. Pennsylvania State Police, 496 Pa. 310, 313, 436 A.2d 1383, 1385 (1981). An action for damages is an inadequate remedy when there is no method by which the amount of damages can be accurately computed or ascertained. Id. Damages cannot be accurately ascertained where the

subject matter of an agreement is an asset that is unique or one such that its equivalent cannot purchased on the open market.  Allegheny Energy, Inc. v. DQE, Inc., 171 F.3d 153 (3d Cir. 1999)(citing Tomb v. Lavalle, 298 Pa.Super. 75, 444 A.2d 666, 668 (1981)).

In Petry, the Pennsylvania Supreme Court observed that enforcement of affirmative covenants (e.g., those requiring the developer in Petry to affirmatively build something), are inherently more difficult to specifically enforce than are negative covenants, i.e., those requiring a party to refrain from action.  514 Pa. at 58-60, 522 A.2d at 1056-57.  The Court held these factors outweighed the injured party's interest in the uniqueness or special value of having the particular property built: "the ability to calculate or ascertain Appellant's money damages; the fact that enforcing an affirmative covenant or contract imposes a supervisory burden on the trial court; the fact that purchasing in reliance on an affirmative undertaking involves greater risk than purchasing in reliance on a negative covenant or promise; and the fact that granting Appellant specific performance would adversely affect the rights of numerous other lot owners and the Community Association at large." Id. at 60, 522 A.2d 1057; See also Toys R' Us-Penn Inc. v. Discovery Zone, Inc., No. Civ. A. 95-2534, 1996 WL 47980 at *3-4 (E.D. Pa. Feb. 6, 1996)(similarly applying these same factors to deny specific performance).  Accordingly, the Pennsylvania Supreme Court affirmed, upholding the transfer of the case by the trial court to the law side of the court because the monetary value of the damages "could be determined to a reasonable degree of certainty through the use of real estate experts and appraisers." Petry, 514 Pa. at 55-56, 522 A.2d at 1054-55.

Notably, specific performance is the exception rather than the rule, and the law as shown in the cases above favors quantification of loss in the form of monetary damages.  This is important, for Defendant has erroneously equated possible difficulty with granting specific

performance to a bar on Plaintiff's ability to here achieve a remedy for breach of contract. Defendant posits legal and/or practical barriers to an order directing it to specifically perform by approving the Centre Square location and then leaps to a conclusion that Plaintiff may not recover in this matter at all. Such logical fallacy is belied by the cases cited above which make clear that the courts actually prefer to quantify the loss and award monetary damages over attempting to enforce an affirmative obligation to perform under a contract. Even accepting arguendo Defendant's posited difficulties with specific performance,, that does not lead to a conclusion that Plaintiff is without remedy, for under both the express terms of the Settlement Agreement as well as established case law, Plaintiff is entitled to establish the monetary equivalency of its loss, i.e., its expectation damages.

Therefore, Plaintiff submits that while the appropriate form of relief – i.e., specific performance by Defendant of providing Plaintiff's a billboard at the Centre Square site versus monetary damages in lieu of specific performance for the value of the billboard site Defendant failed to provide – may require an evidentiary hearing and further testimony and argument, Defendant's breach of the clear, unambiguous terms of the Settlement Agreement to which it agreed is undeniable: Defendant was released from all claims and the underlying lawsuit dismissed with prejudice in exchange for the leasing of land upon which LVL may erect and maintain a billboard, either at an identified site or another location acceptable to LVL, *which has never been provided*. As Defendant has breached by not performing its end of the bargain, Plaintiff is entitled to judgment on the issue of liability, only, with a hearing to follow to determine the appropriate form of relief and/or amount of monetary damages.

## VI.   CONCLUSION

For all of the reasons set forth in the above discussion, Plaintiff's Motion for Summary Judgment should be granted.  Plaintiff asks only that the Court hold Defendant to the agreement it made, before this Court and before the public – to the words it chose, and to the words by which the parties' written deal must be governed.  Plaintiff urges that the court adopt *"the interpretation which under all the circumstances ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished"*: a full and final release and dismissal of claims in exchange for a billboard site acceptable to LVL on which it may erect and maintain a billboard.  That is what the parties bargained for, and that is what each should in fairness receive.  The facts being undisputed, and the words of the Settlement Agreement being clear and unambiguous, the only decision is whether Defendant obtained to itself a windfall of unparalleled release from liability in exchange for absolutely nothing, and for which nothing can be done, or whether the Settlement Agreement means what it says it means, and in the interests of justice obligates Defendant to honorably perform its part of the consideration it promised.

Wherefore, Plaintiff respectfully requests this Honorable Court enter the attached Order granting Plaintiff's Motion for Summary Judgment as to Liability Only, and setting a date and time for a hearing to set damages and/or award such other relief as the Court may deem appropriate and just.

Respectfully submitted:

**BRUNO LAW**


BY:   _s/ Charles Bruno_
       CHARLES BRUNO, ESQ., I.D. #52812
       Attorney for Plaintiff
       44 N. 2nd Street – P.O. Box 468
       Easton, PA 18044-0468
       610-258-4003 (o)
       610-258-1943 (f)

Dated: December 20, 2019

## CERTIFICATE OF SERVICE

I, Charles Bruno, Esq., counsel for Plaintiff LVL Co., LLC in the within action, do hereby certify that Plaintiff's Motion for Summary Judgment as to Liability Only, with accompanying Memorandum of Law, was served and is available for download and viewing via the Eastern District of Pennsylvania Electronic Case Filing System on this 20th day of December, 2019, upon all counsel for the parties.

**BRUNO LAW**

BY:   *s/ Charles Bruno*
      CHARLES BRUNO, ESQ., I.D. #52812
      Attorney for Plaintiff
      44 N. 2nd Street – P.O. Box 468
      Easton, PA 18044-0468
      610-258-4003 (o)
      610-258-1943 (f)

Dated: December 20, 2019